Tuklby, J.
delivered the following opinion of the court.
The legislature of the State of Tennessee, actuated by the universally received opinion, that the education of the masses is the only basis upon which our free institutions can be safely rested, has assiduously labored for a series of years, extending from 1826 to 1835, to create a fund for the establishment of a system of common schools, for the education of the citizens of the State. Great anxiety has at all times been shown by this body, not only for the creation, but for the preservation of this fund: every available means, after making proper provision for the administration of the government of the State, has been appropriated to it, and proper steps taken to preserve and *280 make it effectual. A board of common school commissioners in each county was appointed to superintend it; and by the act of 1827, ch. 64, s. 1, it was appropriated forever to the purposes for which it was designed.
In the year 1835, a convention of the State was called, for the purpose of amending the constitution; and among other important things to which the attention of that body was called, that of education seems to have occupied a prominent position.
In the 10th section of the 11th article of the constitution as amended, it is declared, that knowledge, learning and virtue are essential to the preservation of republican institutions, and that the diffusion of the opportunities and. advantages of education, throughout the different portions of the State, are highly conducive to the promotion of this end. For the furtherance of which, it makes it the dut3r of the General Assembly, in all future periods of this government, to cherish literature and science: and to insure this, it provides, that the fund, commonly called the school fund, and all the lands and proceeds thereof, dividends, stocks, and other property of every description whatever, heretofore by law appropriated by the General Assembly of this State for the use of common schools, and all such as shall hereafter be appropriated, shall remain a perpetual fund, the principal of which shall never be diminished by 'legislative appropriation; and the interest thereof shall be inviolably appropriated to the support and encouragement of common schools throughout the State, and for the equal benefit of all the people thereof; and that no law shall be made, authorizing said fund, or any part thereof to be diverted to any other use' than the support and encouragement of common schools; and that it shall be the duty of the General Assembly, to appoint a board of commissioners, for such term of time as they may think proper, who shall have the general superintendence of said fund, and who shall make a report of the condition of the same, from time to time, under such rules, regulations and restrictions as may be required by law.
The first General Assembly of the State, after the adoption of the new constitution, met in October, 1835, and by an act of that date, chap. 23, made provisions for carrying into effect *281 the requisitions of the said 10th section of the 11th article of the constitution. The first section of the act provides, “that the Treasurer of the State, the Comptroller of the Treasury, and an executive officer, to be called the Superintendent of Public Instruction, who shall be appointed, by joint vote of both branches of the General Assembly, shall be, and they are hereby created and constituted a body politic and corporate, by the name and style of the Board of Commissioners-of Common Schools for the State of Tennessee, who shall have perpetual succession, and by the name and style aforesaid may hold and possess property of every kind, in trust, for the use of common schools, may sue and be sued, plead and be impleaded, answer and be answered unto, defend and be defended, in all courts of record, or in any other place whatever; and also to make, have and use a common seal, and the same to break, alter and renew at their pleasure; and generally to do and execute all acts, matters and things which a corporation or body politic in law may and can lawfully do and execute.” -It further provides, that the Superintendent of Public Instruction shall be President of the Board of Commissioners, and that all notes, bonds, obligations, transfers, or other instruments of writing, made or executed by the Board, shall be signed by him, and when necessary, sealed with the corporate seal of the Board; which Board shall be subject, nevertheless, to legislative modification or repeal.”
The second section provides, that “the Superintendent of Public Instruction shall hold his office for two years, and until his successor shall be elected and qualified, and shall, before entering on the discharge of his duties, enter into a bond, with good and sufficient security, to be approved of by, and made payable to the Governor of the State, in the sum of one hundred thousand dollars, conditioned for the faithful discharge of the duties of his office.”
In pursuance of the provisions of this statute, the General Assembly of the State elected Robert H. McEwen, one of the defendants, Superintendent of Public. Instruction, in the year 1836, who entered into bond, with the other defendants as his sureties, to Newton Cannon, the then Governor of the State, *282 with the penalty prescribed by law, and entered upon the performance of the duties of his office. At the expiration of the term for which he was thus appointed, he was re-elected by the General Assembly; and having again executed his bond, with the same securities, in like penalty, he continued for the space of two years more to discharge the duties of Superintendent of Public Instruction, when another was elected in his stead, and he ceased to have any further connection with the Board of Common School Commissioners.
In the year 1840, the Attorney General, in pursuance of instructions from the General Assembly, given at its session of 1839-40, filed this bill, in the name of James K. Polk, Governor of the State, and successor of Newton Cannon, and in the name of the then existing Board of School Commissioners, seeking to charge the defendant McEwen and his sureties upon the bond, for his alledged malversation in office as Superintendent of Public Instruction.
The case was brought to a hearing in the Chancery Court at Franklin, and an account decreed by the Chancellor, from which an appeal was prosecuted to this court. At the December term, 1841, the case was brought to hearing in this court, an account ordered, and the bases upon which it was to be taken specified, in an opinion delivered by one of the Judges of the court; but before this account could be taken, and acted upon by the court, the General Assembly again met, viz, in October, 1843, when the defendants the sureties of the said Robert H. McEwen, petitioned that body for relief, assigning as reasons therefor, the impossibility of taking the account upon legal principles, without doing them great injustice, and this arising from the deranged state of the currency at the time the common school fund was collected by the Superintendent, from which it necessarily resulted that a large amount of money was received by him in paper of different banks of the United States greatly depreciated, and from the manner in which they had been kept it was impossible to ascertain within any thing approximating to certainty what the loss thus sustained by the fund was, — and for other causes, not necessary here to.specify.
On the 19th day of January, 1844, in accordance with the *283 prayer of the petitioners, it was resolved by the General Assembly, that William Carroll, Willoughby Williams, Nicholas Hobson, and John Marshall, should be appointed commissioners to compromise and settle with the sureties of Robert H. McE.wen, late Superintendent of Public Instruction, the matters in controversy in said suit, upon principles of right and justice towards the sureties, and to. the best interest of the school fund; and that the compromise and decision of said commissioners, or a majority of them, when made and returned into the Supreme Court of the State, should become the judgment of the court, so far as the sureties were concerned.
• On the27thday of January, 1844, it was further resolved by the General Assembly, that if either of the commissioners before appointed should, from, unforeseen circumstances, be unable to act, or should decline to aet, the Governor of the State is authorized to appoint other commissioner or commissioners, in the place of such commissioner or commissioners, as shall thus be unable or unwilling to act. Accordingly, John Waters and M. W. Brown were appointed commissioners by the Governor, in the place of Willougb'y Williams and John Marshall, who declined acting under the resolutions of the 19th of January, 1844.
On the 3rd day of February, 1844, said commissioners, viz, William Carroll, N. Hobson, John Waters and M. W. Brown, made their report of compromise, which was filed in court, and a&ked to be made the decree of the court upon the matters in controversy, so far as the rights and interest of the sureties were effected thereby. This is resisted by the counsel for the complainants, upon constitutional grounds.
It is argued, that the 10th section of the 11th article of the constitution places the school fund beyond the control of the General Assembly, and vests in the Board of Commissioners of Common Schools, who alone have_ the power to collect, compromise, and arrange any debts or demands belonging to thisN ■fund, and placed under their supervision by the act of 1835, chapter 23, and that therefore the resolutions of the General Assembly of January 19th and '27th are in violation of the .provisions of the constitution, and null and void.
*284 la the argument of this proposition it becomes important to enquire, 1st, What was the power of the General Assembly over the common school fund previous to the adoption of the amended constitution of 1834: 2d, What alterations has the instrument made as to this power, and what prohibitions has it introduced in regard to its exercise.
That the legislature of the State, in the absence of constitutional prohibition, is the proper guardian and protector of its funds, no matter for what purpose, appropriated, and that, as such, it is its duty to watch over them, to see that they are properly secured, vested, and applied, as the law may direct, is a proposition so palpably in accordance with reason and necessity, that it were a waste of time to enter into an argument to prove it. It necessarily follows, that if these funds, or any portion of them, be out of the treasury, and in the hands of a citizen, the power to collect, compromise, and arrange the same with the citizen, belongs to the legislature, to be exercised according to its best judgment, for the security and prosperity of the State, and upon principles of right and justice to the citizen.’
This power on the part of the legislature is supreme, and when exercised, cannot be revised, or called in question by any other power whatever; and it may be exercised by that body in its collective capacity, or it may be delegated to a commission, — the decision of which, when made in pursuance of the power delegated, is equally final and conclusive, if the delegation extend thus far. There is in this respect no difference arising out of the nature of the fund. The power is the same, be the fund appropriated or unappropriated — whether it has been set apart for internal improvement, banking operations, common schools, or any other purpose whatever. This power is inherent in the legislative department of the State, and it is neither lost nor diminished by the fact, that curators may have been appointed for the safe keeping of the funds, or to superintend the distribution of them in pursuance of appropriations made by law, such as a treasurer, commissioners of internal improvements, president and directors of a bank founded upon State funds, board of commissioners of common schools, &c. Then the power of the legislature over the school fund, *285 previous to the adoption of the constitution of 1834, was absolute and uncontrollable. It might have been diverted from the purposes for which it was created, at any time, and directed in an entirely different channel: it might have been squandered and wasted upon any wild scheme of speculation or improvement: it might have been appropriated to the payment of our public debt: it might have been distributed in bounties and premiums to our citizens: it might have been given to asylums: it might have been applied to lighten the burden of taxation for the time being; or disposed of in any other way, that might have seemed meet and proper to that body.
Such was the power over this fund, on the part of the General Assembly, at the adoption of the constitution of 1834.
2nd, What is it since?
We have seen that the legislature of the Slate had evinced for years much anxiety to promote a system of common schools; that great attention had been paid to the accumulation of sufficient funds for that purpose; that all available means had been appropriated to it; that a board of common school commissioners had been established in the different counties to superintend it, and that in 1827 legislative provision had been made for the appropriation of this fund forever to the use of common schools.
What change upon this question has been effected by the constitution of 1834? But two. The legislature of 1827 had appropriated the fund forever to the purposes for which it was created. This was a legislative promise, that it should be held sacred; but inasmuch as this promise was not legally binding on subsequent legislatures, the framers of the constitution of 1834 were determined to make it sure, by establishing it as a fundamental principle, not to be violated by legislative enactment. Accordingly, the 10th section of the 11th article makes the fund perpetual, the principal of which shall never be diminished by legislative appropriation, and the interest of which shall be inviolably appropriated to the support and encouragement of common schools throughout the State, and prohibits the passing of any law authorizing said fund, or any part thereof, to be diverted to any other use than the support and encouragement of common schools.
*286 This, then, is one change made upon the system as it existed at the time the constitution was adopted. What is the other?
It is made the duty of the General Assembly to appoint a general board of commissioners for the State, (in place of the board of common school commissioners previously appointed in each county of the State,) who shall have the general superintendence of said fund, and who shall make report of the condition of the same from time to time, under such rules, regulations and restrictions as may be required by law.
The constitution of 1S34, then, prohibits the legislature from doing one thing in relation to the subject, which it might have done previously, to wit, passing any law diverting either the principal or interest of the fund from the purpose for which it was designed, — the support of common schools. And it makes it the duty of the legislature to do one thing which it was not previously bound to do, viz, to appoint a board of commissioners for the State, to have the general superintendence of the fund. All other things are left as they were previously to the adoption of the constitution; that is, subject to the control and discretion of the legislature.
The question then arises at once, Is the adoption of the resolutions of the General Assembly of the 19 th and 27th of January, in relation to the matter in controversy, a violation of either the prohibitory or mandatory provisions of the 10th section of the 11th article of the constitution of 1834? We have seen, that these resolutions are for the appointment of commissioners to compromise and settle with the sureties of Robert H.'McEwen the matters in controversy, upon principles of right and justice towards the sureties, and to the best interest of the school .fund. We have endeavored to show, that the power to settle, arrange and compromise any suit, or demand for money due from a citizen to the general treasury of the State, or which may have been appropriated by the State to any public institution or charity, is inherent in the legislative department of the State, and may be exercised without supervision or control, and that this power may be delegated. The exercise of this power, like all others belonging to the legislative department, can only be restricted by constitutional provision. Is the exer *287 cise of it, in the present case, in conflict with the constitutional prohibition to pass any law diverting the school fund, or any part thereof, to any other use than the support of common schools? We think most clearly not. It is not an attempt at appropriation, but an effort to arrange, compromise and secure a portion of the school fund in the hands of an individual citizen, which was in jeopardy, and but for the existence of this power, and its exercise, might have been entirely lost. It is not an attempt to divert the fund to improper uses, but merely the surrendering a portion, in order to secure the balance. That the power to do this ought to exist, and does exist somewhere, is not denied by the counsel who appear for the complainants: but it is argued that it properly belongs to the Board of Commissioners of Common Schools; that it is dangerous to trust it with the legislature, and that by fair implication it has been taken -from it.
To this, it is to be answered: 1st, That the power of the legislature cannot be restricted by implication; it must be by express prohibition. 2nd, The argument that a power may be abused, is no argument against the vesting it. All human power is liable to abuse, no matter where it is vested; and in the present case there is as much safety in the exercise of it by the legislature as by the Board of Commissioners of Common Schools; perhaps more. If public opinion, and the responsibilities of the members to their constituents, will not guarantee a proper- exercise of it, what assurance have we that a Board of Common School Commissioners may be entrusted with it? In avoiding Scylla, let us be careful that we do not fall upon Charybdis.
But is this power given to the Board of Common School Commissioners, either expressly or impliedly? Most assuredly it is not by the constitution. Is it by the act of 1835, chap. 23?
The General Assembly has thought proper to incorporate the Board of Commissioners for Common Schools, as a matter of convenience, not that the constitution directed it, and has authorized them, as a body corporate and politic, to hold and possess property of every kind in trust for the use of common schools, to sue and be sued, &c. and makes the Superintendent *288 the President of the corporation. Now, that this board has the power to make all contracts relative to the school funds, which are not prohibited by law, and that they may sue and be sued upon them, as a body politic and corporate, and that it may, in its discretion, arrange, compound and compromise any debt due to it, no one will be disposed to deny; but that it has the power to institute a suit against the Superintendent of Public Instruction, for malversation in office, may, we think, well admit of much controversy, because his liability arises out of no contract with the board: he is not appointed by it; his responsibility is not to it, but to the Governor of the State. He is, himself, a member of the board, and the head of it — How shall he bring himself to account? or, shall the Treasurer and the Comptroller, the two subordinate members of the board, act upon the subject without him? Shall he compound and compromise with himself; or shall the other two do so with him? It is in vain to attempt to get rid of these dilficuties, by saying he can be removed, and another substituted in his stead. It is true, this has been done in the present case; but it is equally true, that he might be sued upon his bond without being removed, and it is a case that might easily happen. An honest difference of opinion might exist as to his liability in some particular transaction, and this might be of great moment to the prosperity of the school fund, and yet he be a very useful and honest officer, worthy of being retained, and as such retained; what would then be done? It is not necessary for us to say how this is in the present case; for, even if this power had been given by the act of 1835 expressly to this incorporated board of commissioners, yet the legislature of the State of Tennessee would not be deprived of it thereby. These public corporations are made for public convenience; no private rights are involved in them; and therefore the legislature in interfering with them is in no danger of violating the obligation of contracts or public faith; and although it may have thought proper to delegate a portion of its own legitimate power to such corporation, for the public benefit, yet the same may be resumed at any time, and exercised temporarily by the legislature,, at its discretion; or the corporation may at any moment *289 be deprived of it altogether; and -such has been the constant practice in this State in relation to debts due our State Bank, which the legislature have been in the habit of compromising by resolution, though no one doubts that the president and board of directors have full power to do so themselves; and this constitutes an important difference between a public corporation and a private one. The one is completely under the control of the legislature, and the other is not, Because it is the creation of a contract between the State and'a private individual or individuals, which cannot be interfered with without violating that provision of the constitution which preserves the obligation of contracts.
We are therefore of the opinion, that the resolutions adopted by the legislature of the 19th and 27th of January, 1844, appointing commissioners to compromise and settle the matters in controversy in the present case, is no violation of any rights vested in the incorporated Board of Commissioners for Common Schools; nor is it a violation of that portion of the constitution which prohibits the passage of any law for diverting the school fund, or any portion thereof, -to any other use than the support and encouragement of common schools; and that the legislature had full power and authority inherent, to adopt said resolutions; that it was the proper mode to appoint the commission; that the commissioners had full power and authority delegated to them to make the compromise; that it has been made in'pursuance of that power, and is binding and obligatory upon this court and all persons concerned, and do decree accordingly.